UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KASANDRA JO JORDAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:13-CV-236-CAN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

On March 28, 2013 Plaintiff Kasandra Jo Jordan, ("Jordan") filed her Complaint against Defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), seeking judicial review of the Commissioner's final decision denying Jordan Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). On July 16, 2013, Jordan filed her opening brief requesting reversal or remand of the Commissioner's decision. On December 2, 2013, the Commissioner responded asking the Court to affirm her final decision on Jordan's disability benefits application. Jordan filed a reply brief on December 12, 2013. This Court may enter a ruling on this matter based on the parties' consent, 28 U.S.C. § 636(c) and 42 U.S.C. §§ 405(g).

## I. PROCEDURE

On April 29, 2010, Jordan applied for DIB and SSI alleging disability due to Crohn's disease, depression, and cervical spin degeneration and stenosis with an alleged onset date of May 16, 2007. Her claims were initially denied on August 12, 2010, and were denied again on reconsideration on January 3, 2011. Jordan appeared before an administrative law judge ("ALJ") on November 21, 2011, for a hearing.

On December 2, 2011, the ALJ issued a decision holding that Jordan was not disabled and therefore not entitled to SSI or DIB. On February 2, 2012, the Appeals Council denied Jordan's request for review of the ALJ's decision rendering the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §404.981, 416.1481.[1] Jordan now seeks review of the Commissioner's decision in this Court pursuant to 42 U.S.C. § 405(g).

## II.	ANALYSIS

### A.	Facts

Jordan was 37 years old at the time of her hearing before the ALJ. She completed high school and attended college until she was a sophomore. Jordan is divorced and lives with her mother and her 17-year old daughter. Jordan testified that she had not worked since her alleged onset date of May 16, 2007. She had discontinued her work due to an auto accident. Jordan performed past relevant work as an Inventory Clerk, Retail Department Manager, Teller, and Customer Service Representative. Jordan began her last job in January 2007 working at Kroger in the meat department where she was responsible for inventory, management and ordering, and stocking. When she started the job, Jordan was able to lift and carry approximately 50 pounds or more of meat for at least eight hours a day while standing/walking the entire period. However, after the auto accident in May 2007, Jordan had to quit her job at Kroger after only working there for approximately five months.

### B.	Medical Background

#### 1.	Back, Neck, and Abdominal Pain

---

[1] The regulations governing DIB are found at 20 C.F.R. Part 404. The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. Part 416. For convenience, only the DIB regulations will be cited henceforth in this opinion.

In December 2007, Jordan began seeing Steven Posar, M.D., a pain management specialist, for the treatment of her neck, shoulder, and low back pain. Dr. Posar's initial tests in early 2008 showed changes in her cervical spine as well as disc bulging. By the end of 2008, Jordan's pain had gotten better even though her mobility was "not very good". Doc. No. 8 at 429. To alleviate the pain and other effects, Jordan received a series of epidural steroid injections from Dr. Ralph Carbone over about fifteen months. While receiving the injections, Jordan continued to see Dr. Posar. Dr. Posar noted no major changes even after Jordan was involved in a second car accident in April 2009.

In June 2009, Jordan was hospitalized for five days due to abdominal pain, vomiting, and diarrhea. A History and Physical form, completed by Dr. John Taylor during Jordan's hospitalization, indicated that Jordan's neck pain was controlled with medication and that her physical exam showed no spinal tenderness. The cause of the abdominal pain was not confirmed at that time. In September 2009, Jordan was hospitalized again for a diagnostic laparoscopy for pelvic endometriosis with no complications.

In October 2009, Jordan returned to Dr. Posar for further treatment of neck and back pain. Physical examination revealed that there was no distress and that Jordan had a normal gait and station. Dr. Posar noted that Jordan had moderated neck stiffness, but did have full range of motion without pain. Additionally, he noted full motor strength and made no mention of any radicular symptoms.

In March 2010, an MRI revealed that Jordan had a broad posterior disk osteophyte complex in her cervical spine. Based on this diagnosis, Jordan began physical therapy in May 2010. Jordan complained that the physical therapy caused her headaches, but an MRI revealed

3

no problems with her brain. In June 2010, however, Jordan was discharged from physical therapy after failing to meet long-term goals after she cancelled or "no-showed" three straight sessions.

In July 2010, consultative examiner Dr. Peter Sices examined and evaluated Jordan as part of her disability benefits application. Dr. Sices noted that Jordan had a normal gait and walk with some limitations in her range of motion. Furthermore, Dr. Sices noted no joint swelling or synovitis and that Jordan was able to get on and off the exam table without difficulty. Dr. Sices concluded after the exam that Jordan had no impairment as to gait, coordination, vision, hearing, speech, memory, concentration, attention span, or fine and gross manual dexterity.

During the late part of July 2010, Jordan was evaluated by physical therapist Kristy Showley to determine if more physical therapy was appropriate. Jordan told Showley that she was not driving at that time, had headaches/migraines, was unable to do light housework, experienced pain when watching her daughter play sports, and was unable to lay in supine position. Showley noted that Jordan had a positive Waddell's sign,[2] and noted contradictions, such as Jordan's ability to fix her hair without demonstrating any deficits despite her claims of excessive pain. Showley provided for a "precautionary" two-pound weight restriction, which does not appear to have been reinforced by a doctor's diagnosis. In August 2010, Dr. Posar noted that Jordan's second round of physical therapy had been discontinued because she made no functional improvement. After the therapy ended, Jordan continued to see Dr. Posar for her primary care mainly dealing with abdominal pain and neck pain, which was manageable with pain relievers.

---

[2] Positive Waddell's signs may indicate a non-organic or psychological component to complaints of pain. *See* https://www.mls-ime.com/articles/GeneralTopics/Waddell%20Signs.html

### 2. Crohn's Disease

During Jordan's June 2010 emergency treatment for abdominal pain, a CT scan revealed signs that Jordan may have Crohn's disease. In August 2010, Dr. Eugene Lyubashevky, a gastroenterologist, diagnosed her with irritable bowel syndrome with spastic colon. In February 2011, Jordan returned to the emergency department with pelvic/abdominal pain. During this visit, Jordan was formally diagnosed with Crohn's disease. On March 16, 2011, Jordan visited her local emergency department again with abdominal pain, bloating, nausea, and vomiting. She was then transferred to St. Vincent's Hospital, where a CT scan revealed progression of the Crohn's disease with 15-20 cm of terminal ileal involvement.

After March 2011, Jordan received most of her primary care from Beth Taylor, a nurse practitioner. In June 2011, Jordan underwent a colonoscopy, which showed a tortuous colon. In August 2011, Ms. Taylor noted that Jordan was eating better. Ms. Taylor's progress notes indicate that Jordan had an exacerbation of her Crohn's disease in October and November of 2011, as evidenced by diagnostic imaging. However, Jordan gained weight during this same time period despite having issues with nausea, diarrhea, and progression of the Crohn's disease.

In June 2011, Jordan also saw Dr. Charles Heinsen as her treating physician for various conditions and for a Medical Source Statement related to disability benefits application. According to Dr. Heinsen, Jordan's Crohn's disease could cause her to have twenty to thirty loose stools per day. He also noted that Jordan's anxiety and depression affected her pain and could interfere with her attention and concentration. Dr. Heinsen, along with Ms. Taylor, restricted Jordan to sitting no more than two hours and standing and walking about one hour during an eight-hour workday. Dr. Heinsen opined that both of Jordan's legs required elevation

to waist level for two hours during an eight-hour work day. Dr. Heinsen reported that Jordan would need to lie down or recline in a supine position for thirty-minute period after standing or walking. Dr. Heinsen opined that Jordan needed five hours of rest during each eight-hour workday. As for a weight restriction, Dr. Heinsen stated that Jordan could occasionally lift up to twenty pounds but never lift anything above twenty-one pounds. He said she could occasionally balance, stoop, look down, and look sideways and was limited to occasional use of her hands. Both Dr. Heinsen and Ms. Taylor thought that Jordan's impairments would prevent her from maintaining any type of employment.

### 3. Mental Conditions

In July 2010, Jordan saw Alan Wax, Ph.D, a psychological consultative examiner, complaining of anxiety and depression. Jordan reported a wide range of symptoms and feelings for which she had been prescribed various medications over the years. Jordan told Dr. Wax that some of these medications had caused her adverse side effects. After examining Jordan, Dr. Wax diagnosed major depressive disorder and panic disorder and assigned a Global Assessment of Functioning ("GAF") score of 52.[3] Dr. Wax also noted that Jordan's cognitive functioning appeared to be in the average range and that Jordan is independent in self-care, but does lack motivation at times.

State agency psychological consultants, Benetta Johnson, Ph.D, and Kenneth Neville, Ph.D., also reviewed Jordan's record, including the medical evidence submitted in her file through the reconsideration level of her disability benefits application process. The consultants

---

[3] Physicians assign GAF scores that reflect an individual's overall level of social, occupational, and psychological functioning. *See* American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). A GAF score of 51-60 indicates that a person suffers from moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 34.

found that Jordan had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.

### C. Claimant's Testimony

At the hearing, Jordan testified as to her conditions, treatment history, and work history. Jordan stated that she has been unable to work since May 16, 2007, when she flipped the vehicle that she was driving and sustained injury to her neck, foot, and back. Jordan also discussed her Crohn's disease explaining that it contributed to her inability to work. Jordan stated that she has neck and back pain daily, but "on a good day it is managed by medication, at times." Doc. No. 8 at 59. Jordan had hoped to undergo surgery to alleviate this pain, but the surgery was precluded by the discovery of her Crohn's disease. Jordan testified that the Crohn's disease causes her abdominal pain of varying intensity for which she has had inconsistent results in trying to control. Jordan described her Crohn's as "insufferable" especially on days when it flares up.

When the ALJ asked Jordan about activities that aggravate her conditions, she noted long periods of time on her feet, lifting and moving objects over a certain weight, extreme movements, and pushing and pulling. Jordan also said that sitting in certain positions caused her more pain. For instance, she explained that sitting at a desk looking at a computer screen could increase her neck pain. As to her Crohn's disease, Jordan stated that she has daily pain and that she is on a special diet to help control the condition. Jordan also explained that she suffers from diarrhea every day requiring her to use the bathroom from seven to fifteen times a day. On flare-up days, Jordan said that she can be in the bathroom twenty to twenty-five times. Despite her diet and medications, Jordan finds her condition to be uncontrollable on some days.

7

As for Jordan's mental conditions, Jordan stated that she takes medication for her anxiety and depression. Jordan explained that she does not currently see a therapist or psychiatrist and relies on her family doctor to prescribe her medications.

Jordan testified that she believes she might be able to lift five pounds, but would be unable to repeat this too often as it would cause neck pain. Furthermore, Jordan testified that on a good day that she may be able to walk for half an hour at a time and stand in one position for roughly five to ten minutes. Depending on her position, her ability to sit would vary. For example, she said she could sit in a chair upright for twenty minutes. However, if she was in more of a reclined position, she could sit longer.

Jordan mentioned that she could stoop, squat, and generally manipulate things in her hands. However, Jordan admitted that her conditions cause some things to slip through her fingers at times. As for her daily activities, Jordan indicated that she lays down every day for at least two hours. Jordan admitted that she is independent in personal care tasks, walks outside in her yard, prepares meals for herself and her daughter, and washes dishes and laundry, as well as completing other small chores around the house. Jordan testified that she is also able to go out on her own and drive. Jordan said that she tries to attend her daughter's athletic events, but has difficulty sitting in the bleachers for different reasons. Jordan also reported that she maintains her personal relationships by telephone and social networking websites.

When questioned by her attorney at the hearing, Jordan indicated that her weight fluctuates as much as ten pounds in a week, due to her conditions. Jordan also mentioned that on her "bad" days, she spends a lot of time in bed. During "flare-ups," she noted that she has been hospitalized.

8

**D. Standard of review**

The Social Security Act authorizes judicial review of decisions of the agency. The court will uphold the decision of the agency as long as the ALJ's decision is supported by substantial evidence and free of legal error. 42 U.S.C § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is more than a scintilla and includes evidence that a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of the evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's RFC leaves him unable to perform his past relevant work; and (5) whether the claimant can perform other work in the national economy given the claimant's RFC, age, education, and experience. *Briscoe*, 425 F.3d at 352; 20 C.F.R. § 404.1520(a)(4)(i)–(v). If the ALJ can find that the claimant is not disabled at any step, he does not go on to the next step. 20 C.F.R. § 404.1520(a)(4).

In his decision, an ALJ must, at a minimum, provide the rationale for his decision or

otherwise provide analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that he considered the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not however required to address "every piece of evidence or testimony in the record," but rather provide some insight into the reasoning behind the decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002.

### E. Issues for Review

In this case, Jordan raises four issues for review. First, Jordan alleges that the ALJ improperly determined that Jordan's anxiety and depression were not severe at Step Two of the disability analysis. Second, Jordan challenges the ALJ's RFC determination arguing that (1) the ALJ improperly failed to give controlling weight to the opinion of her treating physician, Dr. Charles Heinsen; and (2) the ALJ failed to evaluate her credibility properly. And lastly, Jordan asserts that the ALJ's Step Five finding was not supported by substantial evidence.

#### 1. The ALJ's Severity Determination

At Step Two of the Social Security disability determination, an impairment is "severe" if it is one that significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a)–(b). An impairment is not severe when medical and other evidence show only a slight abnormality with no more than a minimal effect on the claimant's ability to work. SSR 96-4p; 96-3p; 85-28. In evaluating the severity of mental health impairments, the ALJ must use a technique whereby he first evaluates "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment.

20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of the claimant's functional limitations in activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, 20 C.F.R. § 404.1520a(c)(3). Activities of daily living, social functioning, and concentration, persistence, or pace are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). Episodes of decompensation are rated on a four-point scale of none, one or two, three, and four or more. *Id.* If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. 20 C.F.R. § 404.1520a(d)(1). Otherwise, the impairment is considered severe, and the ALJ must conduct the Step Three analysis and determine whether the severe impairment meets or equals a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). If the severe mental impairment does not meet or equal any listing, then the ALJ will assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

In his opinion, the ALJ must incorporate the pertinent findings and conclusions used to support his severity decision. 20 C.F.R. § 404.1520a(e)(2). The ALJ must identify any significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the claimant's mental impairment. The decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Id*.

In this case, Jordan contends that the ALJ should have determined that her anxiety and depression were severe impairments. Furthermore, Jordan contends that remand is necessary because the ALJ failed to consider all of the relevant evidence that may have affected the Step

Three analysis and the RFC determination at Step Four. Specifically, Jordan challenges the ALJ's alleged rejection of Dr. Wax's diagnosis of Major Depressive Disorder, Panic Disorder NOS, and a GAF of 52. Jordan also claims that the ALJ improperly discounted Dr. Sices' notation that Jordan was emotionally fragile and that she was taking prescription medications for her mental impairments.

Despite Jordan's allegations to the contrary, however, the ALJ did consider Dr. Wax's diagnoses and assessment as evidenced by his discussion of inconsistencies in the evidence, which caused the ALJ to give less weight to Dr. Wax's opinion. For example, the ALJ highlighted Dr. Wax's comment that Jordan was "independent in all aspects of self-care" with no significant cognitive deficits, which conflicted with the GAF score of 52 that Dr. Wax assigned to Jordan indicating moderate impairment in social, occupational, or school functioning. Notably, Dr. Wax's comments also conflicted with the findings of the State agency psychologists, Drs. Johnson and Neville, who noted that Jordan only had mild restrictions in daily living; social functioning; and concentration, persistence, or pace with no episodes of decompensation. Such results do not support a finding of a severe mental impairment. *See* 20 C.F.R. § 404.1520a(d)(1).

Moreover, the ALJ also considered Jordan's concession that she had no ongoing treating relationship with any therapist or counselor. The ALJ also specifically noted that Jordan's only mental health treatment included the medication that she received from her primary care doctor. As a result, the Court is not persuaded that the ALJ disregarded Dr. Wax's opinion and Jordan's medication regimen as Jordan alleges. In fact, the ALJ analyzed and thoroughly explained his decision that Jordan's anxiety and depression did not constitute severe impairments. Therefore,

the ALJ supported his severity determination with substantial evidence such that his severity determination must be affirmed.

## 2. The ALJ's RFC Determination

Having determined that Jordan's degenerative changes of the cervical spine and Crohn's disease constituted severe impairments that did not meet or equal a Listing, the ALJ proceeded to assess Jordan's RFC. An RFC is "an administrative assessment of what work-related activities an individual can perform despite her limitation." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). In making an RFC determination, the ALJ must determine and articulate the weight applied to each medical opinion. SSR 96-8p. A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and is consistent with other substantial evidence in the record. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). However, the ALJ is not required to give the treating opinion controlling weight. If the ALJ rejects a treating physician's opinion or accepts an alternate opinion, he must provide a sound explanation for his decision. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). Even so, the ALJ is not required to detail every reason for discounting a treating physician's report. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

In addition, the ALJ must consider the following factors, identified in the Social Security regulations, when assigning a weight to any medical opinion: (1) the length, nature, and extent of the physician's treatment relationship with the claimant; (2) whether the physician's opinions were sufficiently supported; (3) how consistent the opinion is with the record as a whole; (4) whether the physician specializes in the medical conditions at issue; and (5) other relevant

13

factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)(I)-(ii), (c)(3)–(6); *see also Elder*, 529 F.3d at 415; *Clifford*, 227 F.3d at 871. "If the ALJ discounts the [treating] physician's opinion after considering these factors, [the court] must allow that decision to stand . . . ." *Elder*, 529 F.3d at 415 (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)). Alternatively, remand may be appropriate if the ALJ discounts a treating physician's opinion without considering these regulatory factors. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

In this case, the ALJ found that Jordan retained the RFC to perform a limited range of light work as defined in 20 C.F.R. § 404.1567(b), including lifting and/or carrying up to twenty pounds occasionally and up to ten pounds frequently and standing and/or walking for about six hours and sitting for about six hours in an eight-hour workday, except that Jordan can frequently balance, stoop, kneel, crouch, crawl, and climb ramps or stairs but must never climb ladders, ropes, or scaffolds. In reaching that conclusion, the ALJ considered objective medical evidence, including but not limited to, doctors' testimony, Jordan's own testimony, and other medical evidence that was provided. The ALJ's opinion shows that he did not rely upon any one medical report or doctor. Rather, this ALJ's opinion reflects his consideration of multiple medical opinions and evidence. Jordan contends that even though the ALJ considered the opinion of Jordan's treating physician, Dr. Heinsen, he erred by not assigning controlling weight to Dr. Heinsen's opinion.

In his medical source statement prepared on June 20, 2011, and discussed in the Facts section above, Dr. Heinsen described in detail the effects of Jordan's impairments and opined that her symptoms affected her quality of life such that she could not maintain any type of

14

employment. Dr. Heinsen's statement noted extreme limitations to the tasks Jordan would be able to perform. Despite Dr. Heinsen's familiarity with Jordan's medical issues over time, including reports from other doctors and hospitals about her ongoing medical treatment, the ALJ acknowledged Dr. Heinsen's opinion but noted that he could "find no support for these limitations in the record." Doc. No. 8 at 33. In discounting Dr. Heinsen's opinion, the ALJ also referenced conflicts between Dr. Heinsen's opinion and Jordan's own testimony that she could still perform a wide range of activities of daily living and that her neck pain was largely manageable. *Id.* The ALJ also noted that none of Jordan's other treating or examining physicians assigned functional limitations based on her impairments that would be consistent with the extreme limitations set forth by Dr. Heinsen. *Id.*

In particular, the ALJ relied upon the opinions of consultative examiner Dr. Peter Sices and non-examining state agency physicians Dr. D. Neal and Dr. J. Sands. Jordan challenges the ALJ's reliance on these opinions alleging first that the ALJ failed to cite to key parts of Dr. Sices' opinion that could be consistent with Dr. Heinsen's opinion. For instance, Dr. Sices acknowledged that his examination of Jordan was brief such that he could not evaluate the effects of prolonged activity on her ability to work. In addition, Jordan highlights Dr. Sices' notations that Jordan was emotionally fragile, that her prognosis for improvement was good, and that he had no opinion about the severity or effects of her Crohn's disease.

Second, Jordan contends that all three doctors' opinions were based only on partial medical information. Dr. Sices examined Jordan on July 22, 2010; Dr. Neal's and Dr. Sands' opinions were dated August 11, 2010, and December 27, 2010. Jordan notably underwent additional treatment, including physical therapy, office visits, medical testing, and

hospitalizations after the state agency doctors rendered their opinions.

Of greatest concern to the Court is the ALJ's statement that Jordan "has not sought emergency treatment for abdominal pain since receiving a diagnosis of Crohn's disease" in February 2011. *Id*. Based on this statement and the rest of the ALJ's opinion, the Court finds no evidence to suggest that the ALJ considered Jordan's eight or nine-day hospitalization for symptoms related to her Crohn's disease that began with a trip to Starke County Emergency Department on March 16, 2011.[4] *See* Doc. No. 8 at 625–36. As a result, the Court is not convinced that the ALJ considered all the objective medical evidence when assessing Jordan's RFC. In light of this gap in the ALJ's logical bridge, remand is appropriate for further consideration of Jordan's RFC.

The Court refuses to reach any conclusion about the effect full consideration of all the evidence should have on the Commissioner's ultimate determination on remand. However, the Court recognizes that consideration of all the objective medical evidence could cause the ALJ to reach a different conclusion about the consistency of Dr. Heinsen's opinion with other evidence in Jordan's record, the need to re-contact Dr. Heinsen or any other medical source to gather additional evidence, and ultimately Jordan's disabled status and her eligibility for disability benefits. Therefore, any decision related to Jordan's remaining arguments would be premature. Similarly, because the Court is remanding the Commissioner's decision for further consideration of Jordan's RFC, the Court need not address Jordan's arguments about the ALJ's credibility determination and his Step Four and Five analysis because those determinations will all be

---

[4] Jordan also directs the Court to Jordan's hospitalization records dated December 12, 2011, through December 16, 2011 at Pulaski Memorial Hospital for treatment of Crohn's disease. Because the ALJ's opinion was issued on December 2, 2011, he could not have had access to the December 2011 records Jordan cites. Therefore, they cannot be considered here.

16

dependent upon the new RFC determination.

### III. CONCLUSION

For the reasons stated above, the Court concludes that the ALJ's decision is not supported by substantial evidence. Therefore, this case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**SO ORDERED.**

Dated this 6th Day of June, 2014.

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge